TEXAS & PACIFIC RAILWAY COMPANY *v.* GULF, COLORADO & SANTA FE RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 417. Argued December 2, 1925.—Decided March 1, 1926.

1. In a suit, under par. 18 of § 402, Transportation Act, 1920, to enjoin the construction of railway tracks as constituting an exten-

sion for which a certificate of public convenience and necessity must first be obtained under par. 18 from the Interstate Commerce Commission, the District Court has jurisdiction to decide the issue whether the track is an extension (rather than an industrial track excepted by par. 22) without waiting for that question to be presented to the Commission. P. 271.

2. When applied to for a certificate, (pars. 19–20,) the Commission may pass incidentally upon the question whether the proposed extension is in fact such; for, if it be only an industrial track (par. 22,) the Commission must decline, on that ground, to issue a certificate. P. 272.

3. A carrier desiring to construct new tracks does not necessarily admit, by applying for a certificate, that they constitute an extension, but may submit, and secure a determination of, the question, without waiving any right. P. 273.

4. A party in interest, though entitled to appear and resist an application if one be made, can not initiate proceedings before the Commission against the project, but is afforded an absolute and complete remedy by injunction, under par. 20. *Id.*

5. Every court of general jurisdiction has power to determine whether the conditions essential to its exercise exist. P. 274.

6. On the facts described in the opinion—*held* that a proposed line would be an extension, and not a spur or industrial track. *Id.*

7. In determining what is an extension, the purpose of the Act to develop and maintain an adequate railway system, and therein to curb wasteful competition and the building of unnecessary lines, is the important guide. P. 277.

8. "Spur, industrial, team, switching or side tracks, . . . located wholly within one State," (par. 22,) are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who, being within the same territory and similarly situated, are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. P. 278.

9. But if the purpose and effect of the new trackage is to extend, substantially, the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of par. 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. P. 278.

10. The plaintiff, which, immediately upon learning of defendant's intention to extend its line without obtaining a certificate under § 402, par. 18 of the Transportation Act, protested to the federal and state commissions and began suit for injunction before the construction contract was made—*held* not guilty of laches. P. 279.
4 Fed. (2d) 904, reversed.

APPEAL from a decree of the Circuit Court of Appeals reversing a decree of the District Court (298 Fed. 488) enjoining the construction and operation of a railway extension. See also 266 U. S. 588.

*Messrs. T. D. Gresham* and *Thomas J. Freeman,* for appellant.

*Mr. J. W. Terry,* with whom *Messrs. Homer W. Davis, Gardiner Lathrop,* and *Thomas J. Norton* were on the brief, for appellee.

The rulings or definitions of the Interstate Commerce Commission should have controlling weight.

The testimony of the witnesses as to what constituted a spur or industrial track prior to 1920 should be considered.

It is not the purpose of the Transportation Act of 1920, amending the Interstate Commerce Act, to destroy competition between competing systems.

The construction of an extension of a railroad without a certificate of authority by the Interstate Commerce Commission is prohibited by the Act. In the Interstate Commerce Commission there clearly is vested the primary jurisdiction to determine whether or not a proposed extension is compatible with public interest. Surely it was the intention of Congress also to vest in the Commission the primary power to determine the corollary and subordinate question as to whether or not any proposed track, the construction of which is undertaken without its authority, is an extension and, if an extension, to make an order requiring the carrier to cease and desist from

completing the project unless upon, application, a certificate of convenience and necessity is obtained.  Plainly the construction or operation of a track confessedly an extension may be enjoined; but when in any such injunction suit the question arises as to whether or not the track under construction is a spur track or an extension, then the burden is upon the plaintiff to show that such track is an extension; and that burden may only be sustained by introducing in evidence a finding of the Interstate Commerce Commission to that effect.  Otherwise, the court loses jurisdiction.

The Texas and Pacific Company could have filed a petition and it would have been the duty of the Commission to investigate it.  If the Commission found that the work entered upon was an extension of the defendant's railroad, a finding to that effect would have been made.  Thereupon the Commission or any state commission, or party in interest, including the Texas and Pacific Company, could have brought a suit to restrain the construction or operation (in interstate commerce) of the extension.

Considered and construed alone, the other provisions of the Act authorizing suits for damages by the shipper or other injured party, or suits for mandamus, would have given the courts jurisdiction of such suits without any resort to the Interstate Commerce Commission.  But, notwithstanding such apparent authority, this Court construed those provisions with reference to other provisions, and the general design, of the Act, to secure uniformity in its application and remedies.  *T. & P. v. American Tie Co.,* 234 U. S. 138; *T. & P. v. Abilene Oil Co.,* 204 U. S. 426; *Loomis v. Lehigh, etc., Ry. Co.,* 240 U. S. 43; *Morrisdale v. P. R. R. Co.,* 230 U. S. 304; *Robinson v. B. & O. R. R.,* 222 U. S. 506; *Northern Pacific v. Solum,* 247 U. S. 477; *Director General v. Viscose,* 254 U. S. 498;

*United States* v. *Pacific & Arctic Co.*, 228 U. S. 87; *Houston, etc., Ry. Co.* v. *United States*, 234 U. S. 342. So, upon principle, when Congress adopted the general language at the end of par. 20, § 1, authorizing suit, it must be presumed to have intended that it be construed in the same way as other general language in the Act authorizing suit had been construed. *Great Nor. Ry.* v. *Merchants Elev. Co.*, 259 U. S. 291; *W. & A. R. R.* v. *Georgia Pub. Ser. Comm.*, 267 U. S. 497.

Only appellant could appropriately have invoked the jurisdiction of the Commission.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

Transportation Act, 1920, c. 91, § 402, 41 Stat. 456, 477–8, provides, Paragraph (18): ". . . no carrier by railroad subject to this Act shall undertake the extension of its line of railroad . . . unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction . . . of such extended line . . ." Paragraph (22): "The authority of the Commission [so] conferred . . . shall not extend to the construction . . . of spur, industrial, team, switching or side tracks, . . . to be located wholly within one State . . ." Paragraph (20): "Any construction . . . contrary to the provisions . . . of paragraph (18) . . . may be enjoined by any court of competent jurisdiction at the suit of . . . any party in interest."

This suit was brought by the Texas & Pacific Railway Company [1] in the federal district court for southern Texas

---

[1] The suit was begun by Lancaster and Wallace, receivers of the corporation. The receivership terminated before entry of the final decree in the District Court; and the corporation was substituted as plaintiff.

to enjoin the Gulf, Colorado & Santa Fe Railway Company from constructing wholly within that State projected trackage, sometimes called the Hale-Cement Line. The bill alleges that the line is, within the meaning of the above provision, an extension of the defendant's railroad; that the prescribed certificate from the Interstate Commerce Commission has not been secured; and that operation of the line will result in irreparable injury to the plaintiff, because it will divert to the Santa Fe traffic which would otherwise be enjoyed by the Texas & Pacific. By answer the defendant challenged the jurisdiction of the court, insisted that the line is merely an industrial track, and asserted that the plaintiff is barred by laches. After a full hearing, the District Court entered a final decree enjoining the construction or operation of the line unless and until the prescribed certificate should have been obtained. 298 Fed. 488. The case was first brought to this Court by the Santa Fe on constitutional grounds by direct appeal under § 238 of the Judicial Code. Because no substantial constitutional question was presented, this Court transferred it to the Circuit Court of Appeals for the Fifth Circuit, 266 U. S. 588. There the decree of the District Court was reversed. 4 Fed. (2d) 904. The second appeal to this Court was then taken by the Texas & Pacific under § 241 of the Judicial Code; and the case was docketed here on May 5, 1925. The three objections to granting relief which had been set up in the answer were renewed here.

*First.* The Santa Fe contends that the decree of the District Court was properly reversed, because the Texas & Pacific had not secured a determination by the Interstate Commerce Commission that the projected line constitutes an extension. It is admitted that where projected tracks would confessedly constitute an extension and no certificate has been obtained, a court may enjoin construction, although such prior determination by the Commission

was not made or sought.  The claim is that where the defendant asserts that the proposed tracks do not constitute an extension, the court must, under the doctrine of *Texas & Pacific Ry. Co.* v. *American Tie & Timber Co.*, 234 U. S. 138, and *Northern Pacific Ry. Co.* v. *Solum*, 247 U. S. 477, 483, either dismiss the bill because it is without jurisdiction, or postpone action because it is without power to proceed, unless and until a determination by the Commission of the controverted question shall have been made. It is argued that the issue whether tracks constitute an extension presents an administrative question; that the Commission has power to decide it, because Congress, by conferring authority to determine whether an extension is compatible with the public interest, has by implication conferred authority to determine also the subordinate question whether a proposed track constitutes an extension; that if the Commission finds the track to be an extension, it may under its general powers make an order requiring the carrier to cease and desist from construction and operation unless and until the prescribed certificate is obtained; and that, as the Commission has such primary jurisdiction, its aid must have been invoked before a court can grant relief.

To this argument the provisions of the Act afford a conclusive answer.  Paragraph 18 prohibits construction of an extension without obtaining the certificate.  Paragraphs 19 and 20 provide that a carrier desiring to construct one may apply for the certificate and prescribe the method of proceeding.  Whenever such an application is made, the Commission may pass incidentally upon the question whether what is called an extension is in fact such;[2] for, if it proves to be only an industrial track, the Commission must decline, on that ground, to issue a cer-

---

[2] See *Application of Atlanta & St. Andrews Bay Ry. Co.*, 71 I. C. C. 784, 792; *Operation of lines by Coal River & Eastern Ry. Co.* 94 I. C. C. 389, 393.

tificate.[3]  A carrier desiring to construct new tracks does not, by making application to the Commission, necessarily admit that they constitute an extension.  It may secure a determination of the question, without waiving any right, by asserting in the application that in its opinion a certificate is not required because the construction involves only an industrial track.[4]  But a party in interest who is opposed to the construction is not authorized by the Act to initiate before the Commission any proceeding concerning the project.  If application for a certificate has been made, he may appear there in opposition.  If no such application has been made, paragraph 20 affords him the only remedy.  That remedy is both affirmative and complete.

The function of the court upon an application for an injunction under paragraph 20 is a very different one from that exercised by the Commission when, having taken jurisdiction under paragraphs 19 and 20, it grants or refuses a certificate.  The function confided in the Commission is comparable to that involved in a determination of the propriety or application of a rate, rule or practice.  It is the exercise of administrative judgment. Where the matter is of that character, no justiciable question arises ordinarily until the Commission has acted. Compare *Great Northern Ry. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, 295. The function of the Court upon the application for an injunction is to construe a statutory provision and apply the provision as construed to the facts.  The prohibition of paragraph 18 is absolute. If the proposed track is an extension and no certificate has been obtained, the party in interest opposing construction is entitled as of right to an injunction.  The is-

---

[3] See *Abandonment of line of Missouri Pacific R. R.,* 76 I. C. C. 635.

[4] See *Construction of line by Delaware, Lackawanna & Western R. R.,* 94 I. C. C. 541.

sue presented to the court by a denial that the proposed
trackage is an extension does not differ in its nature from
that raised when the denial is directed to the allegation
that the defendant is an interstate carrier.   Compare
*Smyth* v. *Asphalt Belt Ry. Co.*, 267 U. S. 326, 328–9.  If
the facts are agreed, the question is one of law.  If they
are not agreed, the court must find them.  In the case at
bar, the District Court, having jurisdiction generally of
the parties and of the subject matter, was called upon to
determine whether an allegation in the bill, essential to
the cause of action, was established.  This, the court
clearly had power to do.  Moreover, even if the question
presented were, as contended, properly one of jurisdic-
tion, the objection urged could not prevail.  Every court
of general jurisdiction has power to determine whether
the conditions essential to its exercise exist.

*Second.*  The facts on which the Santa Fe contends
that the proposed line is merely an industrial track are
undisputed.  Dallas is a large interior city.  The Texas &
Pacific extends through it and beyond in a general west-
erly direction; the Santa Fe in a general southwesterly
direction.  Both lines have been operated for many years.
Along the Texas & Pacific, commencing at a point 2½
miles west of the city and extending westward about
2½ miles farther, lies territory known as the Industrial
District.  To its development the facilities and services
furnished by the Texas & Pacific have been essential.  In
it are cement works, oil refineries and metal works.  ·The
traffic moves in carload lots.  All the industries are either
located on its right of way or connect with it by spurs.
To serve the plants that carrier has long switches and
assembling tracks.  No other railroad has any direct con-
nection with any of these industries.  Their traffic from
or destined to the Santa Fe or other lines is interchanged
by the Texas & Pacific at points on its line distant from
these industries from 12 to 30 miles.  Thus, the Texas

& Pacific receives either the whole or a part of the revenue on all the traffic of the district—the richest freight-producing territory in all Texas.

The Santa Fe has no branch line running near to, or in the direction of, any part of the Industrial District.   Hale is a station on its road.   The proposed line is to begin at Hale, where storage and assembling yards are to be located, and is to end in the Industrial District, near the Texas & Pacific right of way.   The air-line distance from Hale to the proposed terminus is only 3¼ miles; but the length of line is 7½ miles, besides spurs, sidings and other subsidiary tracks.   The greater length is necessitated in part by topographical conditions.   These are such that the cost of construction is estimated at $510,000.   There is to be one under crossing, where the new line intersects an interurban line, another where it intersects a highway. There are to be two small trestles and numerous fills and cuts.   In some respects the character of the construction is that commonly used for industrial tracks.   No intention appeared to ballast the track save in stretches where the material was bad.   Second hand 75-pound rails, lighter than those commonly used by the Santa Fe, are to be laid.   But these are heavier than those used on some of its branches.   The ruling grade of the Hale-Cement Line is that prevailing on the Santa Fe branch line running out of Dallas to Paris and Cleburne with which it is to connect.   The right of way averages 100 feet; and it is to be fenced on both sides for its full length.

No industry is now located along the proposed line between Hale and the Industrial District.   The territory adjacent to that part of the line does not now produce any freight tonnage.   The Hale-Cement Line was projected by the Santa Fe in order to reach on its own rails the six plants within the district which lie south of the Texas & Pacific Railroad.   These furnish 80 per cent. of the traffic of the District.   If enabled thus to tap it direct, the Santa

Fe can secure a part of the strictly competitive business, and can eliminate the division of rates with the Texas & Pacific on all freight of the District received from or destined to the Santa Fe lines, which is now necessarily handled as inter-line traffic. The freight revenues which the Santa Fe would thus obtain and divert from the Texas & Pacific are estimated at more than $500,000 a year. No plant now served by the Texas & Pacific lies directly on the proposed line. They are so located that the Santa Fe must, in order to reach them, build in each case a spur track to the plant from the Hale-Cement main line, although it describes a curve, due in part to the desire to connect with each of these plants. The Santa Fe must, in order adequately to perform the transportation service, also build near the industries two side tracks, one 1,200 feet, the other 1,500 feet in length.

The Hale-Cement Line is clearly not a spur in the sense in which that word is commonly used. It presents some of the characteristics of a branch; and a branch is clearly an extension of a railroad within the meaning of paragraph 18. The Santa Fe contends that it constitutes an industrial track within the meaning of paragraph 22, because the line is to be constructed solely for industrial purposes. It shows that, according to the plans, the general public is not to be served; that, except at Hale, there will be no public station for the receipt or delivery of freight; no telegraph service; no express, mail or passenger traffic; that the transportation between Hale and the industries will be confined to carload freight; that it will be conducted as a switching service for which no charge will be made; and that the Hale rate will apply to all traffic on the projected line. It argues that a branch is a line serving one or more stations beyond the point of junction with the main line or another branch, and to or from which stations regular tariff rates are in effect; that an industrial track is a line constructed to

serve or reach industries over which regular scheduled
passenger or freight train service is not performed and for
transportation over which only a switching charge, if any,
is made; and that neither the length of the line, nor the
character of the construction, can convert into a branch
a line of the nature described.

In support of its contention that the proposed line con-
stitutes an industrial track, the Santa Fe cites instructions
differentiating branches from spurs, which are given by
the Interstate Commerce Commission in forms long pre-
scribed for accounting purposes. It points also to uses
made of these terms in other connections by courts,[5] by
the Commission, and by state legislatures. A truer guide
to the meaning of the terms extension and industrial
track, as used in paragraphs 18 to 22, is furnished by the
context and by the relation of the specific provisions here
in question to the railroad policy introduced by Trans-
portation Act, 1920. By that measure, Congress under-
took to develop and maintain, for the people of the United
States, an adequate railway system. It recognized that
preservation of the earning capacity, and conservation of
the financial resources, of individual carriers is a matter
of national concern; that the property employed must be
permitted to earn a reasonable return; that the building
of unnecessary lines involves a waste of resources and that
the burden of this waste may fall upon the public; that
competition between carriers may result in harm to the
public as well as in benefit; and that when a railroad
inflicts injury upon its rival, it may be the public which
ultimately bears the loss. See *Railroad Commission* v.
*Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563;
*The New England Divisions Case,* 261 U. S. 184; *The*

---

[5] Compare *Los Angeles Switching Case,* 234 U. S. 294; *Detroit &
Mackinac Ry. Co.* v. *Michigan Railroad Commission,* 240 U. S. 564;
*Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minneapolis Civic &
Commerce Association,* 247 U. S. 490, 501.

*Chicago Junction Case,* 264 U. S. 258; *Railroad Commission.* v. *Southern Pacific Co.,* 264 U. S. 331. The Act sought, among other things, to avert such losses.

When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms extension and industrial track become clear. The carrier was authorized by Congress to construct, without authority from the Commission, " spur, industrial, team, switching or side tracks . . . to be located wholly within one State." Tracks of that character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiary fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal commission issues its certificate that public necessity and convenience require its

construction.   The Hale-Cement Line is clearly an extension within this rule.

*Third.* The Santa Fe contends that the judgment denying relief was proper also because the Texas & Pacific had been guilty of laches.   This defense was not passed upon by the Court of Appeals.   The District Court overruled it as unsupported in fact, and also on the ground that a plaintiff suing under paragraph 20 represents the public as well as private interests and that, hence, a plaintiff's laches cannot operate as a bar.   We need not determine whether the latter ground is sound; for the facts do not warrant a finding of laches.   The Santa Fe gave no publicity to its purpose.   It had purchased some of the right of way before the Texas & Pacific learned that the line was planned.   The latter protested immediately to both the state and the federal commissions and insisted that the proposed line constituted an extension. The Santa Fe, having been advised by the Interstate Commerce Commission of the Texas & Pacific protest, had some correspondence with the Director of Finance. We need not discuss its import.   The Santa Fe did not file an application for a certificate of public necessity and convenience.   It continued its purchase of the right of way despite the Texas & Pacific protests.   It made the contract for construction of the line after the commencement of the suit.   It proceeded with the construction until stopped by the injunction.   It acted at its peril.

In its appeal to the Circuit Court of Appeals the Santa Fe assigned as error that the decree entered was too broad or was indefinite.   If the objection is well founded, the error may be cured by application to the District Court.

*Reversed.*

MR. JUSTICE McREYNOLDS dissents on the ground that the question should have been first submitted to the Interstate Commerce Commission.